UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:

CHUZA OIL COMPANY,                                          No. 18-11836-t7

      Debtor.

PHILIP J. MONTOYA,
Chapter 7 Trustee,
,

      Plaintiff,

v.                                                         Adv. No. 20-1008-t

PAULA GOLDSTEIN, ROBERT "BOBBY"
GOLDSTEIN, and BOBBY GOLDSTEIN
PRODUCTIONS, INC.,

      Defendants.

## OPINION

The chapter 7 trustee sued defendants to recover alleged preferential or fraudulent transfers made by Debtor. Defendants responded by arguing that the transfers were from earmarked funds and that there was a contemporaneous exchange of new, reasonably equivalent value. The Court tried the proceeding on the merits on May 12, 2021. The uncontradicted evidence shows that while Debtor was transferring the challenged funds to defendants, defendants were transferring eight times that amount to Debtor. The Court concludes that the law and evidence support the asserted defenses. A judgment in favor of defendants will be entered.

A.    Facts. [1]

---

[1] The Court takes judicial notice of its docket in this proceeding, the main bankruptcy case, and Debtor's previous chapter 11 case (No. 14-12842-t11), to consider the contents of the dockets but not the truth of the matters asserted therein. *Johnson v. Spencer*, 950 F.3d 680, 705 (10th Cir. 2020).

The Court finds:

In 2012, Debtor Chuza Oil was operating as a petroleum production company in New Mexico. Defendant Bobby Goldstein controlled Debtor as a shareholder, chief executive officer, and director.

That year Debtor borrowed $500,000 from Leon Goldstein, Bobby's[2] father, evidenced by an Installment Loan Promissory Note (the "Note"). The Note provides for monthly interest-only payments at an annual rate of 9.6%, with a one year maturity. On maturity, Leon had the option to renew the Note on the same terms or demand payment. The Note is secured by certain accounts receivable of defendant Bobby Goldstein Productions, Inc. ("BGPI"). Payment of the Note is guaranteed by BGPI and Bobby. Bobby owns and controls BGPI.

Debtor filed a chapter 11 case in 2014. A plan was confirmed on March 2, 2016. The plan classifies non-insider and insider unsecured creditors in classes six and seven, respectively. Under the plan, class six claimants were to be paid 100% of their claims in 48 monthly payments. Class seven claims were to be paid only after all class six claims had been paid in full. The Note obligation was a class seven claim. At some point between 2012 and plan confirmation, Leon died. Leon's wife, defendant Paula Goldstein, held the Note on the confirmation date.

Despite the distribution scheme under the confirmed plan, Debtor made payments on the Note, from September 2016 through December 2017, totaling $46,885.

Debtor was not profitable after it confirmed its chapter 11 plan. On March 27, 2017, Paula loaned Debtor $99,853.88. In addition, Bobby and BGPI loaned money to Debtor when it ran low on cash. Bobby testified that he and BGPI loaned Debtor money so it could fulfill its obligations to creditors under the confirmed plan.

---

[2] Because three Goldsteins are referred to in this opinion, the Court will use their first names.

The following chart summarizes cash transferred to Debtor from defendants and to defendants from Debtor from September 2016 through December 2017:

| Date | $$ from/(to) BGPI | $$ from/(to) Bobby | $$ from/(to) Paula | Net to Debtor from/(to) all defendants |
|---|---|---|---|---|
| 9/16 activity | ($18,668) | $27,668.50 | $0 | $9,000.50 |
| 10/7/16 | $9,000 | $0 | ($3,500) | $5,500 |
| Other 10/16 activity | $77,810 | ($19,145) | $0 | $58,665 |
| 11/1/16 | $21,000 | $0 | ($3,125) | $17,875 |
| 11/30/16 | $25,000 | $0 | ($2,750) | $22,250 |
| Other 11/16 activity | $40,000 | ($15,108) | $0 | $24,892 |
| 12/16 activity | $60,600 | ($21,610) | $0 | $38,990 |
| 1/6/17 | $25,000 | $0 | $0 | $25,000 |
| 1/10/17 | $0 | $0 | ($3,125) | ($3,125) |
| Other 1/17 activity | $23,250 | ($14,986.35) | $0 | $8,263.65 |
| 2/3/17 | $14,300 | $0 | ($3,125) | $11,175 |
| Other 2/17 activity | $756 | ($27,452.91) | $0 | ($26,696.91) |
| 3/7/17 | $31,000 | $0 | ($3,125) | $27,875 |
| 3/27/17 | $0 | $0 | $99,853.88 | $99,853.88 |
| 3/31/17 | $26,500 | $0 | ($3,125) | $23,375 |
| Other 3/17 activity | ($5,416.63) | ($24,003) | $0 | ($29,419.63) |
| 4/17 activity | ($3,900) | ($1,764) | $0 | ($5,664) |
| 5/16/17 | $16,200 | $3,150 | ($3,125) | $16,225 |
| Other 5/17 activity | $500 | ($12,586) | $0 | ($12,086) |
| 6/17 activity | $26,600 | $23,905.33 | $0 | $50,505.33 |
| 7/20/17 | $12,650 | $0 | ($6,250) | $6,400 |
| Other 7/17 activity | $22,700 | $415 | $0 | $23,115 |
| 8/17 activity | ($8,726.11) | $10 | $0 | ($8,716.11) |
| 9/6/17 | $9,000 | $0 | $0 | $9,000 |
| 9/7/17 | $0 | $200 | ($6,250) | ($6,050) |
| Other 9/17 activity | $6,704.02 | ($2,250) | $0 | $4,454.02 |
| 10/13/17 | $6,000 | $0 | ($3,125) | $2,875 |

| | | | | |
|---|---|---|---|---|
| Other 10/17 activity | $60 | $100 | $0 | $160 |
| 11/3/17 | $0 | $3,150 | ($3,135) | $15 |
| Other 11/17 activity | $677.71 | $384.50 | $0 | $1,062.21 |
| 12/1/17 | $3,200 | $0 | ($3,125) | $75 |
| Other 12/17 activity | $696.15 | $123 | $0 | $819.15 |
| Total | $422,493.14 | ($79,798.93) | $52,968.88 | $395,663.09 |

In July 2018 an involuntary chapter 7 petition was filed against Debtor. The Court entered an order for relief in August 2018. Plaintiff Philip Montoya was appointed the chapter 7 trustee.

Debtor made five payments totaling $15,635 to Paula in the year before the involuntary filing (the "One Year Transfers") and another $31,250 in payments the year before that. Plaintiff asserts three claims against the defendants: Count One seeks to avoid the One Year Transfers as insider preferential transfers (§ 547(b));[3] Count Two seeks to avoid all $46,885 in payments ("All Transfers") as actual fraudulent transfers (§ 548(a)(1)(A)); and Count Three seeks avoid All Transfers as constructive fraudulent transfers (§ 548(a)(1)(B)).

The Court entered the parties' pretrial order, which contains, inter alia, the following stipulated facts:

- Defendants were insiders of Debtor at all relevant times;
- At the time of All Transfers, Paula was a creditor of Debtor;
- All Transfers were made to Paula;
- All Transfers were made for the benefit of Bobby and BGPI;
- All Transfers were made while Debtor was insolvent;
- The One Year Transfers were made between ninety days and one year before the date of the filing of the petition;
- The One Year Transfers enabled Paula to receive more than she would have received if (i) as a case under chapter 7 of the Bankruptcy Code (ii) the One Year Transfers had not been made, and (iii) Paula received payment of such debt to the extent provided by the provisions of the Bankruptcy Code;
- Under the Plan, Leon and any successor in interest, including Paula, was to receive payment from Debtor on the class seven claim only if all class six claims were paid in full.

---

[3] All statutory references are to 11 U.S.C. unless otherwise indicated.

- At all relevant times, at least one class six claim under the plan remained due and owing.
- All Transfers were made on account of the Note.

B.    Count One: Avoiding Insider Preferential Transfers (§ 547(b)).

Subject to defendants' defenses, the stipulated facts established the elements of an insider preference claim.[4] Thus, the focus of the trial was on the asserted defenses.

1.    The Earmarking Defense.

"Earmarking" is a judicially-created doctrine said to apply when a new creditor pays a debtor's existing debt to an old creditor. This doctrine originally arose under the Bankruptcy Act in codebtor cases—the new creditor, who was obligated on an existing debt as a guarantor or surety, provided Debtor with funds to pay the old creditor.

*In re Moses*, 256 B.R. 641, 645 (10th Cir. BAP 2000) (collecting cases).

In such cases, courts reasoned that the codebtor's payment to the old creditor did not constitute a transfer of debtor's property, and there was no diminution of the debtor's estate inasmuch as the amount available for unsecured creditors remained the same as before the transfer regardless of the debtor's control of the transferred funds. Courts also noted that earmarking was equitable because if the transfer were avoided, the codebtor would be subject to double liability.

*Id.* at 646. As to co-debtors, the earmarking doctrine has been recognized and approved by the Supreme Court. *See Nat'l Bank of Newport v. Nat'l Herkimer Co. Bank*, 225 U.S. 178, 185, 187 (1912) ("The fact, then, is not, as it is contended, that 'the bankrupt parted with property to the amount of the note, and the bank received it,' but rather that the bankrupt parted with nothing, and the bank received the money of the indorser….The bank dealt with the…indorser of the paper; and the trustee failed to establish any right to recover the moneys it received.").

---

[4] I.e., a transfer to Paula on account of an antecedent debt (the Note), made while Debtor was insolvent, within a year of the petition date, that enabled Paula to receive more than if she had not gotten the transfer and held a general unsecured claim in Debtor's hypothetical chapter 7 case. § 547(b).

*Moses* questions whether the earmarking doctrine should be extended beyond co-debtor cases. 256 B.R. at 651. *Moses* addressed a situation "where the new creditor is not a guarantor but merely loans funds to the debtor for the purpose of enabling the debtor to pay the old creditor.'" *Id.* at 646, quoting *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 566 (8th Cir. 1988). In such case "the earmarking doctrine does not help either the new creditor or the debtor. In fact the new creditor is harmed. He is a general creditor whose recovery must come from a debtor's estate which is diminished to the extent that the payment made to the old creditor cannot be recovered as a preference. The only person aided by the doctrine is the old creditor, who had nothing to do with earmarking the funds, and who, in equity, deserves no such benefit." *Moses*, 256 B.R. at 646 (quoting *Bohlen*, 859 F.2d at 566). "In conclusion, when determining whether a transfer is avoidable under § 547, the earmarking doctrine should not be extended beyond codebtor cases." *Moses*, 256 B.R. at 651.[5]

The trustee challenges the earmarking doctrine's continued validity in this circuit, citing *Moses*. His reliance on *Moses* is misplaced because this is a co-debtor case: Bobby and BGPI guaranteed payment of the Note. Neither the BAP nor the Tenth Circuit has questioned the continued vitality of the earmarking doctrine in co-debtor cases. Furthermore, cases in other jurisdictions indicate that earmarking is alive and well in co-debtor cases. *See*, *e.g.*, *Matter of Corland Corp.*, 967 F.2d 1069, 1076 (5th Cir. 1992) ("Payments on a guaranty, however, are not 'property of the estate' because the funds come from the guarantor, not the debtor."); *Brown v. First Nat. Bank of Little Rock, Ark.*, 748 F.2d 490, 491 (8th Cir. 1984) ("[P]ayments made by an indorser, surety or guarantor do not effect a preference because there is no transfer of the debtor's

---

[5] The Tenth Circuit has twice cited to *Moses* neutrally while distinguishing the facts. *See In re Marshall*, 550 F.3d 1251, 1257 n.5 (10th Cir. 2008); *Matter of Wagenknecht*, 971 F.3d 1209, 1215 n.5 (10th Cir. 2020).

property....", quoting Collier); *In re Flooring Concepts, Inc.*, 37 B.R. 957, 961 (9th Cir. BAP 1984) ("Payments made by a contract debtor of a bankrupt to a creditor of the bankrupt do not become part of the bankruptcy estate where there is an independent obligation on the part of the debtor to pay the creditor."); *In re Kenosha Liquidation Corp.*, 158 B.R. 774, 779 (Bankr. E.D. Wis. 1993) (quoting *Brown*).[6]

Bobby's uncontradicted and plausible testimony was that he and BGPI intended the loaned money to be used, in part, to pay Paula on the Note. As Bobby controlled Debtor, the funds were used as intended, usually on the same day they were received. Consequently, the funds paid to Paula were not Debtor's property. *See* § 547(b) ("the trustee may avoid any transfer of an interest of the debtor in property"). The trustee's preference claims therefore fails.

2.     The Contemporaneous Exchange for New Value Defense. Defendants also assert the contemporaneous exchange for new value defense.[7] "The purpose of the contemporaneous exchange exception, like that of the other section 547(c) exceptions, is to encourage creditors to continue to deal with troubled debtors without fear that they will have to disgorge payments received for value given. If creditors continue to deal with a troubled debtor, it is possible that bankruptcy will be avoided." 5 Collier on Bankruptcy ¶ 547.04[1] (16th Ed. 2021).

---

[6] *See also Brown*, 748 F.2d at 492 n.6 ("The bankruptcy court appeared to imply that, had the co-makers paid the money into Ark-La's account and then drawn a check from that account to pay the Bank, a preference would have been created. We disagree....'Where payment to a creditor is made by one liable as an indorser or guarantor, out of his own funds, the creditor has not received a preference from the insolvent debtor. It does not matter that in the course of the transaction the party secondarily liable may have paid the money to the debtor, to be given by him to the creditor, and the debtor may have turned it over to the creditor'") (quoting *Grubb v. General Contract Purchase Corp.*, 18 F. Supp. 680, 682 (S.D.N.Y.1937).

[7] "The trustee may not avoid under this section a transfer— (1) to the extent that such transfer was— (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange[.]" Section 547(c)(1).

The exception can apply even if the new value is furnished by a third party rather than the creditor. *See* 5 Collier on Bankruptcy ¶ 547.04[1][c]; *Moses*, 256 B.R. at 652; *Matter of Fuel Oil Supply & Terminating, Inc.*, 837 F.2d 224, 231 (5th Cir. 1988) ("[U]nder these circumstances, new value received by a debtor need not be provided by the creditor to whom the transfer was made but may be provided by the fully secured third party. We therefore hold that the elements of § 547(c)(1) are satisfied[.]"); *In re ESA Environmental Specialists, Inc.*, 709 F.3d 388, 398 (4th Cir. 2013); *In re WB Services, LLC*, 590 B.R. 553, 565 (Bankr. D. Kan. 2018).

Section 547(c)(1) only "protects transfers that do not result in a diminution of the estate—unsecured creditors are not harmed by the targeted transfer if the estate was replenished by an infusion of assets that are of roughly equal value to those that were transferred." *Moses*, 256 B.R. at 652 (citing *In re Electronic Metal Products, Inc.*, 916 F.2d 1502, 1505 (10th Cir. 1990) and *In re Robinson Bros. Drilling, Inc.*, 877 F.2d 32, 33–34 (10th Cir. 1989)). In *Moses*, the court found that the transfer at issue diminished the estate because the new value was a secured loan that took the place of an unsecured loan. 256 B.R. at 652. Thus, the pool of assets available to unsecured creditors declined.

Here, Bobby, BGPI, and Debtor intended the loans to be contemporaneous exchanges for new value for the payments to Paula. The trustee does not dispute their contemporaneity. Rather, he argues that Bobby and BGPI did not give equivalent new value to the estate because the net effect of the transactions was to convert subordinated debt into unsubordinated debt, harming non-insider creditors.

The trustee's argument must be overruled. The value exchanged was not simply the payment of subordinated debt; defendants also transferred to Debtor a net of about $400,000, more than eight times the money paid to Paula. For each of the 13 challenged payments to Paula, there

was a contemporaneous exchange of new value greater than the amount of the payment. In some cases the difference was trivial (e.g. a $75 difference for the transfers on December 1, 2017) but most often the difference was quite significant. For example, on March 7, 2017, BGPI transferred $31,000 to Debtor, while Debtor transferred $3,125 to Paula. Similarly, on March 31, 2017, BGPI transferred $26,500 to Debtor while Debtor transferred $3,125 to Paula. Overall, there was more than enough exchange value for the § 547(c)(1) defense to prevail. The Court finds that there was a contemporaneous exchange for new value.

C.    Count Two: Actual Fraudulent Transfers (§ 548(a)(1)(A)).

Section 548(a)(1) provides in part:

> The trustee may avoid any transfer…of an interest of the debtor in property…that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–
>     (A) made such transfer…with actual intent to hinder, delay, or defraud any entity to which the debtor was or became…indebted . . . .

1.    Intent. The trustee argues that All Transfers were done with the actual intent of hindering, delaying, or defrauding creditors. "[T]he focus of the Court's inquiry must be on the debtor's state of mind" when considering whether there is actual intent to defraud creditors. *In re Kelly*, 2016 WL 1558458, at *7 (Bankr. D.N.M.). However, "[i]ntent to hinder, delay, or defraud creditors is rarely admitted by a debtor[, t]herefore, a court may consider circumstantial evidence establishing badges of fraud." *In re Kelsey*, 270 B.R. 776, 782 (10th Cir. BAP 2001) (citing *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1338–39 (10th Cir. 1998)). Courts will often use the nonexclusive badges of fraud listed in the Uniform Fraudulent Transfer Act and the Uniform Voidable Transfer Act when considering actual fraud under the Bankruptcy Code. *See* 5 Collier on Bankruptcy ¶ 548.04[1][b][i]; *In re Picacho Hills Utility Company, Inc.*, 2019 WL 3268797, at *4 (Bankr. D.N.M.). The badges are whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* Here, Debtor was insolvent when the transfers were made, and they were made to an insider. There are no other indicia of fraud. The Court concludes that the defendants did not make the transfers with the actual intent to hinder, delay, or defraud creditors.

2. <u>The Earmarking Doctrine</u>. Furthermore, the trustee cannot prevail on his § 548(a)(1) claim because of the earmarking doctrine. In *In re TriGem America Corp.*, 431 B.R. 855 (Bankr. C.D. Cal. 2010), the court held that the earmarking doctrine could be asserted in a fraudulent transfer proceeding:

> In the Court's view it is far more illuminating to consider the theoretical underpinnings of the earmarking doctrine. The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference (or arguably a fraudulent conveyance) must involve a "transfer of an interest of the debtor in property." *In re Bohlen Enterprises Ltd.*, 859 F.2d at 565. But "transfer of an interest of the debtor in property" is equally a statutory requirement of an action under § 548(a)(1) as it is for preferences. If creditors have no other right or expectation of resort to property which has been transferred to a debtor for an earmarked purpose, then why should it matter that the theory of avoidance of that property's transfer is in preference or fraudulent conveyance? In both instances what matters is that in an earmark case there is no diminishment of the estate, and it is that diminishment of assets that would otherwise be available to pay creditors that is at the heart of all avoidance actions….Reduced to its essence, the earmarking defense merely holds for the unsurprising conclusion that where creditors would

not otherwise have any reason or expectation to look to the assets transferred, there is no diminution of the net recovery on account of the earmarked funds and there can therefore be no avoidance. It is not so much an affirmative defense as it is a challenge to the trustee's claim that the particular funds are part of the bankruptcy estate.

431 B.R. at 864 (citations and footnotes omitted). The Court agrees with *TriGem* that, at least in the case of co-debtors, the earmarking doctrine is a valid concept in fraudulent transfer actions. Because the transfers in question were made from "earmarked" funds, they were not transfers of debtor's property, so § 548(a)(1) does not apply.

E.     Count Three: Constructive Fraudulent Transfers (§ 548(a)(1)(B)).

A transfer of Debtor's property can be avoided if Debtor did not receive reasonably equivalent value in exchange for the transfer and Debtor was insolvent when the transfer occurred. § 548(a)(1)(B). As outlined above, the transfers at issue were "earmarked" and therefore were not of Debtor's property. The trustee therefore cannot prevail on Count Three.

In addition, the trustee loses on Count Three if Debtor received reasonably equivalent value for its transfers to Paula. "Reasonably equivalent value" is not defined in the Bankruptcy Code, but "value" is defined for § 548 purposes as meaning "property, or satisfaction or securing of a present or antecedent debt of the debtor". § 548(d)(2)(A). Generally, repayment of an antecedent debt, like a loan, satisfies the reasonably equivalent value requirement. 5 Collier on Bankruptcy ¶ 548.03[5] ("With this type of value, something is exchanged or given for the purpose of reducing an obligation or debt already incurred and outstanding. Payment of a pre-existing debt is value, and if the payment is dollar-for-dollar, full value is given. This is so even if the payment is on a contingent obligation, such as a guaranty."); *In re Propex, Inc.*, 415 B.R. 321, 324 (Bankr. E.D. Tenn. 2009) ("[A]s a matter of law, a payment made on account of antecedent debt…is a transfer

made for reasonably equivalent value."); *In re Nirvana Restaurant Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) (guaranty is an "antecedent debt").

The trustee argues that Debtor did not receive reasonably equivalent value because the antecedent debt paid with the transfers was subordinated debt. Had the retirement of debt been the only value Debtor received for the transfers, the argument might have merit—from the standpoint of general unsecured creditors, paying subordinated debt diminished the estate. However, the estate also received $395,663 in cash from the defendants. These funds, coupled with the payment of the subordinated antecedent debt, were more than enough to constitute reasonably equivalent value. For this reason as well, the trustee cannot prevail on Count Three.

Conclusion

Two key facts differentiate this avoidance action from a typical one. The first is the large amount of money defendants transferred to Debtor—about eight times what Debtor transferred to Paula. Indeed, Paula herself loaned Debtor twice what Debtor paid her. Second, some of the money defendants transferred to Debtor was earmarked by Bobby and BGPI to pay Paula on the Note. Such funds therefore were not estate property and not subject to avoidance or recovery. The Court will enter a final judgment in favor of defendants.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: July 16, 2021

Copies to: Counsel of record